ACCEPTED
07-16-00455-CR
SEVENTH COURT OF APPEALS
AMARILLO, TEXAS
6/23/2017 7:59 PM
Vivian Long, Clerk

Case No. 07-16-00455-CR

IN THE COURT OF APPEALS FOR THE

SEVENTH DISTRICT OF TEXAS

AMARILLO, TEXAS

FILED IN
7th COURT OF APPEALS
AMARILLO, TEXAS
6/23/2017 7:59:42 PM
VIVIAN LONG
CLERK

_____

KALISCIA ELONDA MILLSAP

Appellant

VS.

THE STATE OF TEXAS

Appellee

_____

On Appeal from Potter County Court at Law #1
Potter County, Texas in Cause No. 144,188
Honorable W.F. "Corky" Roberts, Judge Presiding

_____

APPELLEE'S BRIEF

_____

POTTER COUNTY ATTORNEY'S OFFICE
ATTORNEYS FOR APPELLEE,
THE STATE OF TEXAS

/S/ C. Wade Overstreet
C. Wade Overstreet
500 S. Fillmore, Room 301
Amarillo, Texas 79101
Tel. No. 806.379.2255
Fax No. 806.379.2215
Email: wadeoverstreet@co.potter.tx.us
State Bar of Texas ID No. 24029758

## Certificate

By my signature below, I certify:

1. as required by Tex. R. App. P. 9.4(i)(3), that this petition contains 6,453 total words, as determined by the word count on Relator's computer program; and,

2. that on today's date, June 23, 2017, a copy of this petition has been served: (a) in person on Appellant by e-mail at lawofficesofdarrellcarey@gmail.com, through the Court's electronic filing manager system, as required by Tex. R. App. P. 9.5(e).

/S/ C. Wade Overstreet
C. Wade Overstreet

# Table of Contents

## Contents

Certificate..............................................................................................................2

Table of Contents................................................................................................3

Index of Authorities...........................................................................................3

Statement Regarding Oral Argument ..................................................................4

Statement of Facts...............................................................................................5

Summary of the Argument.................................................................................12

Argument............................................................................................................12

    Sufficiency of the Evidence Standard of Review.................................................12

    Hypothetically Correct Jury Charge ...................................................................16

    Principles of Review Applicable to Terroristic Threat........................................19

    Issue No. One: Appellant's Threats Not Conditional; if Conditional, Sufficient 22

    Issue No. Two: Appellant's Threats were Imminent and Sufficient....................24

    Conclusion ...........................................................................................................27

Prayer .................................................................................................................28

# Index of Authorities

## Cases

*Campbell v. State*, 139 S.W.3d 676, 683 (Tex. App.—Amarillo 2003, pet ref'd) 13, 14

*Cook v. State*, 940 S.W.2d 344, 348-49 (Tex. App.—Amarillo, pet. ref'd).... passim

*Geick v. State*, 349 S.W.3d 542, 545 (Tex. Crim. App. 2011) ................................14

*Gillette v. State*, 444 S.W.3d 713, 723 (Tex. App.—Corpus Christi 2014, no pet.) ...................................................................................................... 16, 22, 25

*Heinert v. Wichita Falls Hous. Auth.*, 441 S.W.3d 810, 818 (Tex. Amarillo 2014, no pet) ................................................................................... passim

*Henzler v. State*, 07-12-00523-CR, 2014 WL 5337833, at *4 (Tex. App.—Amarillo, Oct. 15, 2014, no pet.) (not designated for publication) ............... 13, 15

*In re A.C.*, 48 S.W.3d 899, 904 (Tex. App.—Fort Worth 2001, pet. denied) .. 19, 20

*Jackson v. Virginia,* 443 U.S. 307, 33 S. Ct. 2781, 61 L.Ed.2d 560 (1979) ...........13

*Jones v. State*, 07-16-00345-CR, 2017 WL 1908586, at *4 (Tex. App.—Amarillo May 8, 2017, no pet. h.) (not designated for publication.) ........................... 20, 24

*Little v. State*, 246 S.W.3d 391, 398 (Tex. App.—Amarillo 2008, no pet.)............14

*Ramos v. State*, 407 S.W.3d 265, 268-71 (Tex. Crim. App. 2013) .........................18

*Robinson v. State*, 466 S.W.3d 166, 172 (Tex. Crim. App. 2015) ..........................13

*Robinson*, 466 S.W.3d at 172................................................................................14

*Shepard v. State,* 244 S.W.3d 421, 423 (Tex. App.—Amarillo 2007, pet. ref'd) ...15

*Sledge v. State*, 953 S.W.2d 253, 255-56 (Tex. Crim. App. 1997) .........................18

*Taylor v. State*, 450 S.W.3d 528, 535 (Tex. Crim. App. 2014)................................13

*Walker v. State,* 327 S.W.3d 790, 794-95 (Tex. App.—Fort Worth 2010, no pet.) ................................................................................................................. 18, 20

*Williams v. State*, 194 S.W.3d 568, 575 (Tex. App-Houston [14[th] Dist.] 2006, aff'd on other grounds, 252 S.W.3d 353 (Tex. Crim. App. 2008) ................... 20, 21, 22

*Williams v. State*, 432 S.W.3d 450, 455-56 (Tex. App.—San Antonio 2014, pet. ref'd) ................................................................................................. 20, 21

**Statutes**

Tex. Penal Code Ann. §1.07(41)(A) (West 2011)..................................................17

Tex. Penal Code Ann. §1.07(46) (West 2011) .....................................................17

Tex. Penal Code Ann. §22.07 (West 2011) ....................................... 15, 17, 23, 25

Tex. Penal Code Ann. §6.03(a) (West 2011)........................................................16

[Statement Regarding Oral Argument](#)

Appellee will join Appellant in waiving oral argument.

## Statement of Facts

With a few exceptions, the State is generally satisfied with substance Appellant's statement of facts; however, because Appellant's brief lacks record citation, Appellee offers the following as its statement of facts.

Kaliscia Elonda Millsap was an employee of the Community Development Department (CDD) of the City of Amarillo from approximately September 2015 through February 2016, when she was "let go" or "fired." (RR 8-9). Around 11:00 a.m. on February 22 or 23, City of Amarillo CDD employee, Amy Dixon, received a call from Millsap. (RR 9). Millsap agrees that she spoke to Dixon "by telephone." (RR 41, 53-54). According to Dixon, Millsap was "upset." (RR 9). She and Dixon discussed "how the coworkers in the office had spoke bad about her." (RR 11). Millsap related that two CDD "caseworkers were talking bad about the job that Ms. Millsap had performed." (RR 13). Millsap identified those caseworkers as "Angelina Martinez and Vanessa Morales." (RR 13). Millsap said Martinez had "spoke bad" about her. (RR 13). Martinez had told a CDD client that Millsap had approved the client(s) for housing, but "when they came to the top of the list, the two caseworkers had told them they didn't qualify." (RR 13-14). Dixon's reaction upon hearing this information from Millsap was, "oh, wow." (RR 14). Millsap may have misheard Dixon's comment. (RR 14).

Upon hearing Dixon's words, Millsap "got very loud and said, oh, well? Oh, well?" (RR 14). Dixon described Millsap as being "[v]ery angry." (RR 14), (a proposition with which Millsap agreed at trial, stating, "yes, it did," when asked if multiple reports of people talking badly about her made her angry. (RR54-55)). Millsap then said, "you bitches need to realize I'm not from Texas. I'm from California, and I carry a gun at all times." (RR 14). Millsap denied having mentioned anything about a weapon during her phone conversation with Dixon. (RR 54).[1] Dixon ended the phone call by hanging up on Millsap. (RR 17). At that time, Dixon was aware that Millsap surfed the internet looking at firearms, because she had observed Millsap do so. (RR 17). Dixon also new that Millsap would sometimes "go out . . . to the river and shoot guns." (RR 24). Millsap later acknowledged "she told [Dixon] that she carried a gun," (RR 41), a fact which Millsap corroborated. (RR 54).

Prior to this phone call, Dixon "had no problems with" Millsap. (RR 20), yet, Dixon understood herself to be included in Millsap's "you bitch[es]" comment, (RR 20-21). Millsap's statements made Dixon "feel nervous, and . . . scared." (RR 18). Millsap was "angry, because she had misheard what I said." (RR 18). Millsap later acknowledged "she was upset because people were talking about her at work." (RR 41). Millsap denied being upset with Dixon, but admitted she

---

[1] However, in her brief, Appellant appears to concede that she did make this statement. (Appellant's Brief pg. 2, ¶ 1).

"was upset with the whole issue of the client approaching me." (RR 54). Describing the situation surrounding her dismissal, Millsap said "it was fucked up." (RR 42-43). When asked if she felt personally threatened by Millsap's statements, Dixon stated, "[a]t that point I felt that she was very angry at me, yes." (RR 18). On cross examination defense counsel attempted to have Dixon minimize her reaction to Millsap's statements, but Dixon refused to abandon her position, stating she "felt it was a threat in the beginning." (RR 21).

On March 1st, 2016, between 4:00 and 5:00 o'clock, Millsap and Michelle Martinez, a program coordinator with the City of Amarillo's CDD Office, had an encounter at the Toot-n-Totum convenient store at 8th and Buchanan. (RR 27). Millsap agreed that this encounter occurred. (RR 39-40). Millsap had been at city hall, picking up her last paycheck." (RR40). Martinez was leaving the store and returning to CDD when she heard somebody say, "hey, why you looking so mad for?" (RR 27). When Martinez looked up, she "recognized Kaliscia." (RR 27). Martinez then walked over to Millsap, who was in the driver's seat of her vehicle. (RR 27-28).

Martinez asked Millsap how she was doing, in response to which Millsap said, "she thought she was doing okay." (RR 28). Martinez then asked Millsap if "she had left us to get another job." (RR 28). In reply, Millsap stated "she was dismissed from the Community Development Department." (RR 28). Until that

time, Martinez did not know that Millsap had been dismissed. (RR28). Up to that point, Martinez described her relationship with Millsap as "good." (RR 28). During the conversation, Millsap expressed that "her dismissal wasn't handled properly, because she felt like she was a really good worker, hard worker." (RR 28). Continuing, Millsap stated, "they," an apparent reference to her former employer, "[s]aid she wasn't following the rules according to our administration." (RR 29). Millsap then said she "wasn't a clock-watcher like [their] boss." (RR 29). Millsap's boss was James Allen, (RR 29), with whom Millsap "had some issues . . . reference to her dismissal." (RR 34).

Martinez testified that Millsap said "[s]he knew a lot of people in this town—a lot of people on Section 8—clients on Section 8 housing that had mentioned to her that there was some bad-mouthing at a meeting that was held—an annual meeting that was held with the clients and the caseworkers."[2] (RR 30). Millsap corroborated that "she was upset that people were bad-mouthing her and were saying that they were having to do her work for her." (RR 40). Specifically, Millsap said she was being bad-mouthed by "Angelina Martinez . . . her friend . . . and that geeky girl with the glasses," whom Martinez understood to be "Addie Traider." (RR 30).

---

[2] "Section 8 housing is rental assistance for low to moderate income families who can't afford to pay most of their rent or all of their rent." (RR 31).

Millsap next said, "what these . . . mother fuckers don't realize is that I carry a gun."[3] (RR 30). Then Millsap made another statement, saying "if she felt threatened or anything like that she would fucking shoot them."[4] (RR 30). Millsap then "grabbed her makeup bag from the floorboard" and "pulled it up." (RR 30). In that bag was "a silver square - - a square shaped gun," (RR 30), which Millsap "pulled . . . out." (RR 30). Millsap showed it to Martinez, "then she put it back on the floorboard." (RR 30-31). At that point in the conversation, Martinez told Millsap that she "had to go." She told Millsap, "bye." Millsap's daughter was in the car with her when this happened. (RR 31).

Martinez reaction to Millsap's statements was shock. (RR 32). She didn't feel threatened personally, but she "was scared for Angelina, Vanessa Morales, and Addie Traider," who were other employees of the CDD office. (RR 32). Martinez walked back to the CDD office and "told the [CDD] administrator, James Allen, of the conversation because [she] felt it was important for him to know." (RR 32). Martinez next shared her story with other members of the CDD staff. (RR 32). Before long, "the entire office got wind of it" and "they all collectively said, hey, you have got to call the police because this is - - this is a threat towards employees." (RR 32). Martinez testified that "other employees felt really scared,

---

[3] In her brief, Appellant appears to concede that she did make this statement. (Appellant's Brief pg. 2, ¶ 2).

[4] Appellant also appears to concede she made this statement. (Appellant's Brief. pg. 2, ¶ 2).

especially Angelina, Vanessa, and Addie." (RR 33). Defense counsel attempted to get Martinez to concede that it was not "until this thing kind of caught fire at the office . . . that you felt like there was a threat there," (RR 36), but Martinez rejected that assertion, stating, "No. I immediately went to my supervisor, because I felt that he needed to deal with it." (RR 36).

At trial, Millsap acknowledged that Martinez description of their conversation at Toot-n-Totum was mostly correct. (RR 56). She acknowledged that she expressed frustration about Mr. James Allen and "about people talking poorly about [her]." (RR 56). Millsap denied making any comment to Martinez about shooting anybody, and she denied showing Martinez a gun; however, Millsap acknowledged that during her conversation with Martinez, (RR 57), she did have a gun in the car, in a makeup bag, and moved it from one place to another. (RR 57). If anything, Millsap contends Martinez must have just seen the butt of the gun, which may have been sticking out of her makeup bag. (RR 58, 63).

A couple of days after Millsap's encounter with Martinez at Toot-n-Totum, Millsap was interviewed by Amarillo Police Sargent, Curt Gable, after she was placed under arrest. (RR 38-39). During that interview Millsap told Sgt. Gable: "she had two guns, two pistols," was in the process of obtaining her hand gun license, and "carried a gun in her car." (RR42). Indeed, Millsap acknowledge that "she thought there was a Ruger .22" in her car the day she talked to Martinez;

however, she contended that it was black. (RR 42-43). At trial, Millsap again corroborated the presence of the Ruger .22 at the time of her conversation with Martinez. (RR 63). In addition to the Ruger, Millsap also told Sgt. Gable she owned a Derringer. (RR 43). Sgt. Gable related Martinez's story about what had happened at the Toot-n-Totum to Millsap, and asked Millsap why Martinez would lie about it, Millsap stated, "there shouldn't be a reason she would lie about it." (RR 44).

Despite denying she spoke about guns with either Dixon, on the phone, (RR 60) or Martinez, at Toot-n-Totum, (RR 61), under direct examination by defense counsel, Millsap agreed she had talked about guns, having guns, owning guns, or using a weapon for protection, but "it was in reference to using it for protection only." (RR 59). Additionally, defense counsel asked Millsap "if a statement were make about, 'if I feel threatened by anybody, I will protect . . . myself,' would it have been in that context only?" (RR 59). Millsap, in response thereto replied, "that context only." (RR 59). Yet, Millsap twice denied having made such a conditional statement. She first denied it under direct examination by defense counsel (RR 56-57), and she denied it a second time when the Prosecutor asked Millsap if she had made such a statement. Her response was, "I never said that." (RR 62). Additionally, Millsap testified that during their phone conversation, she did not feel like Amy Dixon was threatening her, (RR 55), and she testified

generally that she did not "feel threatened by anybody at the city." (RR 58). Millsap also testified that she "used to" have a temper. (RR 65). Millsap explained that when she was previously charged with assault with a deadly weapon in California, in which she stabbed her ex-boyfriend, a charge which was later reduced to a misdemeanor, it was actually a case of self-defense. (RR 66-67).

## Summary of the Argument

Appellant's points are wrong, and disproven by the facts and relevant law. Appellant's first point asserts that the "threat," as if there were only one, was conditional, and therefore insufficient. That is simply incorrect. Only one of three threating statements is arguably conditional, and even if the Court concludes the third threat is conditional, it and the other threats are all legally sufficient to sustain the trial court's judgment. As to Appellant's second point, that Appellant's threat (or threats) was/were not immediate, Appellant entirely misapprehends the law. That law does not require the threats to be immediate, but imminent. Under relevant law, Appellant's threats meet that standard.

## Argument

### Sufficiency of the Evidence Standard of Review

Appellant presents the Court two issues. In her first issue, Appellant argues the trial court committed error, because Appellant's threat, if any, was conditional. (Appellant's Brief pg. 1). In her second issue, Appellant argues that the threat, if any, was not immediate. (*Id.*). With both issues, Appellant essentially argues that the evidence is insufficient to support the trial court's judgment. (Appellant's Brief pgs. 3-4).

"The standard a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense the State is required to prove beyond a reasonable doubt is the standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 33 S. Ct. 2781, 61 L.Ed.2d 560 (1979)." *Henzler v. State*, 07-12-00523-CR, 2014 WL 5337833, at *4 (Tex. App.—Amarillo, Oct. 15, 2014, no pet.) (not designated for publication) (citing *Brooks v. State,* 323 S.W.3d 893, 912 (Tex.Crim.App.2010)). "Under that standard, in assessing the sufficiency of the evidence to support a criminal conviction [the reviewing court] considers all the evidence in the light most favorable to the verdict and determines whether, based on that evidence and reasonable inferences to be drawn therefrom, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (citing *Jackson,* 443 U.S. at 319, Brooks, 323 S.W.3d at 912).

Sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Id.* (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). This standard applies equally to bench trials. *Robinson v. State*, 466 S.W.3d 166, 172 (Tex. Crim. App. 2015); *Taylor v. State*, 450 S.W.3d 528, 535 (Tex. Crim. App. 2014); *Campbell v. State*, 139 S.W.3d 676, 683 (Tex. App.—Amarillo 2003, pet ref'd); (citing *Golihar v. State*, 46 S.W.3d 243 (Tex. Crim. App. 2001). "A conviction that is not rationally based on the evidence violates the Due Process Clause, whether a judge or jury sits as the fact finder in the case." *Robinson*, 466 S.W.3d at 172.

A hypothetically correct jury charge is one "that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Geick v. State*, 349 S.W.3d 542, 545 (Tex. Crim. App. 2011); *Campbell*, 139 S.W.3d at 683 (citing *Malik,* 953 S.W.2d 239-40). "When a statute lays out several alternative methods of committing an offense, and the indictment alleges only one of those methods, 'the law as authorized by the indictment' is limited to the method specified in the indictment." *Id.* (citing *Golihar*, 46 S.W.3d 254-255). "[A]bsent a notice-based motion to quash, a charging instrument need allege only the statutory

elements of the offense." *Id.* (citing *Ex Parte Luna*, 784 S.W.2d 369, 371 (Tex. Crim. App. 1990) (op. on rehearing).

When conducting a sufficiency of the evidence review, the reviewing court "must give deference to the responsibility of the fact finder to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Little v. State*, 246 S.W.3d 391, 398 (Tex. App.—Amarillo 2008, no pet.) (citing *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). The reviewing court does not resolve any conflict of fact, weigh any evidence, or evaluate the credibility of any witness, as those are functions for the trier of fact. *Id.* (citing *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999)).

"In a bench trial, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony." *Shepard v. State,* 244 S.W.3d 421, 423 (Tex. App.—Amarillo 2007, pet. ref'd) (citing *Kmiec v. State*, 91 S.W.3d 820, 822 (Tex. App.—Houston [1st Dist] 2002, pet. ref'd). A reviewing appellate court "may not sit as a thirteenth juror, but must uphold the . . . verdict unless it is irrational or unsupported by more than a 'mere modicum' of evidence." *Id.* (citing *Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988).

Finally, an appellate court reviewing a sufficiency of the evidence point "must evaluate all of the evidence in the record, both direct and circumstantial,

whether admissible or inadmissible." *Henzler,* 07-12-00523-CR, 2014 WL 5337833, at \*4 (citing *Dewberry*, 4 S.W.3d at 740).

Hypothetically Correct Jury Charge

By a three count information,[5] each count naming a different victim (Angelina Martinez, in Count One; Amy Dixon, in Count Two; and, Michelle Martinez, in Count Three), the State charged Appellant with threating "to commit an offense involving violence to a person, MURDER OR AGGRAVATE ASSAULT WITH A DEADLY WEAPON, with intent to place [each of the three victims] in fear of imminent serious bodily injury." (CR 7). The State further alleged each of the victims was a public servant, because all were employees of "AMARILLO COMMUNITY DEVELOPMENT." (*Id.*). The substance of the State's information describes the Penal Code offense of, Terroristic Threat. Tex. Penal Code Ann. §22.07 (West 2011).

Terroristic Threat is a "conduct-oriented offense," *Gillette v. State*, 444 S.W.3d 713, 733 (Tex. App.—Corpus Christi 2014, no pet.), proscribing "six separate terroristic objectives." *Id.* at 729; Tex. Penal Code Ann. §22.07. In this case, as to all three counts, the State's charging instrument specifically alleged Appellant's commission of an offense under Tex. Penal Code §22.07(a)(2), which

---

[5] Appellee agrees with Appellant that Count Three of the State's information was waived.

required that Appellant threatened "to commit any offense involving violence to any person with intent to . . . place any person in fear of serious bodily injury." Tex. Penal Code Ann. §22.07(a)(2) (West 2011).

"Intent," as used in the State's information, is defined by Texas Penal Code §6.03, describing that "[a] person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct . . ." Tex. Penal Code Ann. §6.03(a) (West 2011).

In connection with the offense of Terroristic Threat, this Court has defined "threat" to mean "a declaration of intention or determination to inflict punishment, loss or pain on another, or to injure another by the commission of an unlawful act." *Heinert v. Wichita Falls Hous. Auth.*, 441 S.W.3d 810, 818 (Tex. Amarillo 2014, no pet) (citing *Cook v. State*, 940 S.W.2d 344, 347 (Tex. App.—Amarill0 1997, pet. ref'd)). "Put another way, a 'threat' is a 'communicated intent to inflict harm or loss on another or on another's property.'" *Id.*

Regarding the statutory term "imminent," as used in connection with the type of Terroristic Threat described by Tex. Penal Code §22.07(a)(2), this Court has described that term as meaning, "near at hand; mediate rather than immediate; close rather than touching; impending; on the point of happening; threatening;

menacing; perilous." *Heinert*, 441 S.W.3d at 818 (original quotation marks omitted) (citing *Devine v. State*, 786 S.W.2d 268, 270 (Tex. Crim. App. 1989)).

"Serious bodily injury," another statutory term employed in the §22.07 (a)(2) subpart of the Terroristic Threat statute, means "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." Tex. Penal Code Ann. §1.07(46) (West 2011).

"Public Servant," as used in Tex. Penal Code §22.07(c)(2), is defined in relevant part as, "a person elected, selected, appointed, employed, or otherwise designated as . . . an officer, employee, or agent of government." Tex. Penal Code Ann. §1.07(41)(A) (West 2011).

Appellee contends that the State's information in this case, together with the above defined terms, substantially constitutes the theoretically correct jury charge by which the Court will assess the sufficiency of the evidence in this case.[6]

---

[6] As to Count Two, Appellee acknowledges that it alleged "the 1st day of March, 2016," as the date of offense in which Amy Dixon was the named victim, (CR 7) and that record evidence supports that the offense may have been committed on February 22nd or 23rd, 2016, as well as on March 1st; however, the information also preceded the alleged date of offense with the words, "On or about." (*Id.*). The State need not allege a specific date in its charging instrument, and moreover, "on or about" language in a charging instrument "allows the State to prove a date other than the one alleged in the indictment as long as the date is anterior t the presentment of the indictment and within the statutory limitations period." *Sledge v. State*, 953 S.W.2d 253, 255-56 (Tex. Crim. App. 1997). Appellee requests the Court to take judicial notice of the date of offense alleged in the information, as well as the date it was filed with the clerk (CR 7). Further, Appellee would ask the Court to take judicial notice that the alleged date of offense was within the two year limitations period applicable to Class A and B misdemeanor offenses under Tex.

## Principles of Review Applicable to Terroristic Threat

"In order to commit this offense of terroristic threat under Subsection (2), 'the accused must have the specific intent to place any person in fear of imminent serious bodily injury.'" *Heinert*, 441 S.W.3d at 818 (citing *Walker v. State*, 327 S.W.3d 790, 794 (Tex. App.—Fort Worth 2010, no pet.). "Intent can be inferred from the acts, words, and conduct of the accused." *Id.* For the offense to be complete, "it is not necessary that the victim or anyone else was *actually* placed in fear of imminent serious bodily injury." *Id.* (citing *Dues v. State*, 634 S.W.2d 304, 305-06 (Tex. Crim. App. [Panel Op.] 1982)). "It is immaterial to the offense whether the accused had the capability or the intention to carry out his threat." *Heinert*, 441 S.W.3d 818 (citing *Dues*, 634 S.W.2d at 305-06).

Contrary to Appellant's suggestion that, "[t]he focus should on the inquiry should be whether the victim, was afraid of imminent serious bodily injury at the time of the offense," citing *Williams v. State*, (Appellant's Brief pg. 3), "[t]he offense is complete if the accused, by his threat, sought as a desired reaction to place a person in fear of imminent serious bodily injury." *Heinert* at 818, (citing *Dues* at 306).

---

Code of Criminal Procedure Art. 12.02. A hypothetically correct jury charge need not incorporate allegations that give rise to an immaterial variance. *Ramos v. State*, 407 S.W.3d 265, 268-71 (Tex. Crim. App. 2013).

When examining the element of imminence, it is appropriate for the reviewing court to consider the impact of the actor's statements on the victim. *In re A.C.*, 48 S.W.3d 899, 904 (Tex. App.—Fort Worth 2001, pet. denied) (citing *Stults v. State*, 23 S.W.3d 198, 205 (Tex. App.—Houston [14th Dist.] 2000, per. Ref'd)). Indeed, the *Williams v. State* language Appellant quotes supports this principle, although it has nothing to do with the conditional nature of a Terroristic Threat. It was in connection with the 14th Court's examination of the "imminence" element of the offense in which the court stated, "we must look to the proximity of the threatened harm to the condition," *Williams v. State*, 194 S.W.3d 568, 575 (Tex. App-Houston [14th Dist.] 2006, aff'd on other grounds, 252 S.W.3d 353 (Tex. Crim. App. 2008) (citing *Cook v. State*, 940 S.W.2d 344, 348 (Tex. App.—Amarillo 1997, pet. ref'd), and then notes, "the focus of the inquiry should be on whether the victim was afraid of imminent serious bodily injury at the time of the offense." *Williams*, 194 S.W.3d at 575 (citing *Stults*). "[T]hreatening to commit an act could cause fear of imminent serious bodily injury if, in the mind of the victim, the commission of the act was 'near at hand' or 'hanging threateningly over one's head.'" *Jones v. State*, 07-16-00345-CR, 2017 WL 1908586, at *4 (Tex. App.—Amarillo May 8, 2017, no pet. h.) (not designated for publication.).

While a court cannot determine intent to commit the offense of Terroristic Threat "merely from what the victim thought at the time of the offense," *Heinert*,

441 S.W.3d 818 (citing *Dues*, 634 S.W.2d at 305-06), it may infer intent from the perception of those hearing or receiving the threat. *Walker v. State,* 327 S.W.3d 790, 794-95 (Tex. App.—Fort Worth 2010, no pet.); *In re A.C.*, S.W.3d 899, 904 (Tex. App.—Fort Worth 2001, pet. denied) (stating, "the reaction of the victim—regardless of whether the threat was real or was carried out—is some evidence of the defendant's intent."); *Williams v. State*, 432 S.W.3d 450, 455-56 (Tex. App.—San Antonio 2014, pet. ref'd) (stating, "Because our analysis considers 'the desired and sought after reaction of the listener 9or of the complainant) regardless of whether the threat is real or weather the threat is carried out, [as constituting] some evidence of the intent of the protagonist,' [the complainant's] actions are also relevant.") (parentheses and brackets in original).

Conditioning threat of harm on occurrence or nonoccurrence of future event does not necessarily mean that harmful consequences threatened are not imminent and does not prevent threats from amounting to Terroristic Threat. *Cook v. State*, 940 S.W.2d 344, 348-49 (Tex. App.—Amarillo, pet. ref'd); *In re A.C.*48 S.W.3d at 904 (citing *Cook*); *Williams I*, 194 S.W.3d at 575 (citing *Cook*). "Once the defendant makes a threat to commit a violent offense seeking the 'desired reaction to place a  person in fear of imminent serious bodily injury,' the offense of terroristic threat is completed." *Williams II*, 432 S.W.3d at 454.

## Issue No. One: Appellant's Threats Not Conditional; if Conditional, Sufficient

Appellant made three separate threatening statements. Appellant made her first threatening statement to Amy Dixon on February 22nd or 23rd, 2016, stating, "you bitches need to realize I'm not from Texas. I'm from California, and I carry a gun at all times." (RR 14). As is apparent from the text of this statement, nothing about it is conditional. Appellant's second threat was communicated to Michelle Martinez at the Toot-n-Totum on March 1st, 2016, (RR 27). The threat consisted of these words: "what these . . . mother fuckers don't realize is that I carry a gun." (RR 30). The context strongly suggests that Appellant was contemplating Angelina Martinez, among others, when she made that statement. *Id.* Again, nothing in that statement suggests it is conditional. Appellant's third threatening statement was also made to Michele Martinez during the encounter at the Toot-n-Totum. The third statement consisted of the following words: "if [Appellant] felt threatened or anything like that she would fucking shoot them." (RR 30). Martinez testified Millsap included Angelina Martinez in her reference to "them." (RR 30). This statement, arguably, is conditional, but to reiterate, conditioning threat of harm on occurrence or nonoccurrence of future event does not necessarily mean that harmful consequences threatened are not imminent and does not prevent threats from amounting to Terroristic Threat. *Cook*, 940 S.W.2d at 348-49.

The court's examination is on the proximity of the threatened harm to the condition," *Williams*, 194 S.W.3d 575. "[T]he focus of the inquiry should be on whether the victim was afraid of imminent serious bodily injury at the time of the offense." *Id.* Appellant's stated condition was, feeling "threatened or anything like that." Black's Law Dictionary defines threat as "a communicated intent to inflict harm or loss on another or another's property." *Gillette v. State*, 444 S.W.3d 713, 723 (Tex. App.—Corpus Christi 2014, no pet.) (citing BLACK'S LAW DICTIONARY 1618 (9TH ed. 2009)). The bounders of "or anything like" are broad. Many things could be included in that statement, including attacks on Appellant's reputation. As a consequence, the court have reasonably concluded, as the prosecutor argued, that Appellant perceived people bad mouthing her performance as an employee of CDD as a threat, inflicting harm or loss on her reputation within the community. Given that the harm had already occurred, a harm she attributed to three specific individuals, including Angelina Martinez, the proximity of the threatened harm, "fucking shooting them," was very close to the condition, feeling "threatened, or anything like that." Again, here it is important to recall that Michelle Martinez testified that Angelina Martinez "felt really scared," upon learning of Appellant's statement and actions on March 1st, 2016. (RR 33). Based on the content of Appellant's words and Angelina Martinez reaction, it was reasonable for the court to conclude that Angelina Martinez was afraid of

imminent serious bodily injury. Appellants' statements were not conditional, and if one was, all were sufficient to support the court's judgment.

## Issue No. Two: Appellant's Threats were Imminent and Sufficient

Initially, Appellee would point out that Appellant miscasts or misapprehends this issue. In connection with her statement, "if she felt threatened or anything like that, she would fucking shoot them," Appellant contends, "[t]his is not a threat and is not immediate." (Appellant's Brief pg. 4. ¶ 3). However, Tex. Penal Code §2.07(a)(2) does not require that Appellant place a victim in fear of threatened "immediate" serious bodily injury, rather, the law requires that Appellant's place the victim in fear of threatened *imminent* serious bodily injury. Tex. Penal Code Ann. §22.07(a)(2) (West 2011). Here, Appellant makes the same mistake as the Court describes in the *Jones* case, "Appellant confuses the victim's 'fear of imminent serious bodily injury' with the perpetrator's imminent (temporal and physical) ability to carry out that threat." *Jones*, 07-16-00345-CR, 2017 WL 1908586, at *4. Moreover, "imminent" means "near at hand; *mediate rather than immediate*; close rather than touching; impending; on the point of happening; threatening; menacing; perilous." *Heinert*, 441 S.W.3d at 818.

Appellant's first statement was made: on the heels of her dismissal from her job in the CDD, a situation she described as "fucked up,"(RR 42-43); during the course of a conversation in which she  discussed "how the coworkers in the office

had spoke bad about her," (RR 11), which Appellant agreed, made her angry (RR 54-55), and in which Dixon described Appellant as being "upset," and "very angry," (RR 14); and after specifically identifying two former coworkers, "Angelina Martinez and Vanessa Morales," (RR 13), who were "talking bad about the job [she] performed." (RR 13). Moreover, when Appellant made her statement to Dixon, Dixon knew Appellant surfed the internet looking at firearms, (RR 17), would sometimes "go out . . . to the river and shoot guns," (RR 24), and that Millsap "carried a gun." (RR 41, 55). And, contrary to Appellant's assertion, (Appellant's Brief pg. 1, ¶ 2), Dixon did feel threatened by Appellant's statement. (RR 18). Dixon testified that Appellant's statement made her "feel nervous, and . . . scared." (RR 18). Additionally, Dixon testified that she understood herself to be included in Millsap's "you bitch[es]" comment. (RR 20-21).

Appellant's second threat was communicated to Michelle Martinez at the Toot-n-Totum on March 1st, 2016, (RR 27). The threat consisted of these words: "what these . . . mother fuckers don't realize is that I carry a gun." (RR 30). Nothing in that statement suggests it is conditional. Through Martinez, Appellant's threat was communicated to the entire CDD office. (RR 32). Appellant made this statement after specifically stating she was "being bad-mouthed by "Angelina Martinez . . . her friend . . . and that geeky girl with the glasses," whom Martinez

understood to be "Addie Traider." (RR 30). On the heels of making the statement, Appellant showed Martinez a handgun. (RR 30).

Martinez testified that after she got back to the office, and her encounter with Appellant was disseminated, "other employees felt really scared, especially Angelina, Vanessa, and Addie." (RR 33). Nothing in Tex. Penal Code §22.07 (a)(2) dictates or limits the manner in which a threat must be communicated. Tex. Penal Code Ann. §22.07(a)(2). Threats have been found sufficient when delivered by voice mail, *Cook*, 940 S.W.2d 344, *Heinert*, 441 S.W.3d 810, letter, *Gillette*, 444 S.W.3d 713, and in a veiled manner, *Id.* at 725. Given that Appellant's statement was made just after picking up her last pay check, within walking distance of CDD, and in tandem with showing Martinez a handgun, the court could have readily inferred that it was Appellant's intent for Martinez to relay her acts and statements to other members of the CDD Office, including Angelina Martinez, just as if she would have left them on an answering machine, and that her statement was intended to create within Angelina Martinez fear of imminent serious bodily injury.

Appellant's third threatening statement was also made to Michele Martinez during the encounter at the Toot-n-Totum, and reported back to the CDD Office by her. The third statement consisted of the following words: "if [Appellant] felt threatened or anything like that she would fucking shoot them." (RR 30). Here

again, the perceived reference was to Angelina Martinez, Addie Traider, and Vanessa (last name unknown). (RR 33). Here again, the court have reasonably inferred that it was Appellant's intent for Martinez to relay her acts and statements to other members of the CDD Office, including Angelina Martinez, just as if she would have left them on an answering machine, and that her statement was intended to create within Angelina Martinez fear of imminent serious bodily injury.

Appellant's first, second, and third statements were all sufficiently impenitent to support the court's judgment.

## Conclusion

Appellant's first, second and third statements were, at a minimum, menacing, thus each constituted a threat. *Heinert*, 441 S.W.3d at 818. If not meant to menace Dixon and her coworkers, including Angelina Martinez, what other reasonable purpose could Appellant's statements have had? Contrary to Appellant's assertion, it could not have been "in the vein of self-defense," (Appellant's Brief pg. 4, ¶ 3)[7], because as Appellant testified at trial, she did not feel threatened by Dixon or any other of her former coworkers. (RR 55, 58).

---

[7] Appellee does not see how Appellant's citation to *George v. State*, 841 S.W.2d 544 (Tex. App.—Houston [1st Dist.] 1992) supports her argument on this point.

Dixon's reaction, "feeling scared." is evidence of both of Appellant's intent, and of the imminence of the harm Dixon perceived. The same is true for Angelina Martinez, whom Michele Martinez described as feeling really scared. Appellant's intent can also be inferred from the fact that she made not one, but three threatening statements, two of which are plainly unequivocal. *Cook*, 940 S.W.2d 348.

Based on the above facts, reasonable inferences therefrom,  and law, the trial court could have reasonably concluded  Appellant's direct statement to Dixon and indirect statement to Angelina Martinez, constituted threats intended to create fear of infliction imminent serious bodily injury on both.

Testimony also supported that both were employees of the City of Amarillo. Thus, the evidence is sufficient to support the court's conviction of Appellant for Count One and Count Two.

In sum, the evidence was sufficient in this case to support the trial court's judgment.

## Prayer

Appellee prays that the Court:

1. hold that Appellant's threats were not conditional and evidence was sufficient to support the court's judgment, or if conditional, still sufficient to support the court's judgment;

2. hold that Appellant's threats were imminent the evidence sufficient to support the court's judgment; and,

3. Affirm the courts judgment, in all respects.