In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-17-00129-CR
NO. 09-17-00130-CR

_____

**MICHAEL CHARLES MCCARTY, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 75th District Court
Liberty County, Texas
Trial Cause No. CR31891 (Counts 1 and 2)**

**MEMORANDUM OPINION**

In a single indictment, the State charged Michael Charles McCarty with two counts of abuse of official capacity stemming from a series of incidents between January 1, 2013 and January 1, 2015. Both counts of the indictment alleged abuse of official capacity in an ongoing scheme or course of conduct. *See* Act of May 29, 1993, 73rd Leg., R.S., ch. 900, § 1.01, sec. 39.02, 1993 Tex. Gen. Laws 3586, 3673–

1

74, *amended by* Act of May 11, 2009, 81st Leg., R.S., ch. 82, § 1, 2009 Tex. Gen. Laws 127, 127 (amended 2015) (current version at Tex. Penal Code Ann. § 39.02 (West 2016)).

Count One of the indictment alleged McCarty misused government personnel and Count Two alleged McCarty misused government property. Both counts included specific instances of alleged misuse with values greater than $1,500.00 but less than $20,000.00. McCarty pleaded not guilty. A jury convicted McCarty on both counts and determined the value was between $20.00 and $500.00 on each count which, at the time, was a Class B misdemeanor. *See* 1993 Tex. Gen. Laws at 3673, *amended by* 2009 Tex. Gen. Laws at 127.[1] McCarty received a six-month probated sentence on each count and a fine of $2,000.00. McCarty now appeals.

McCarty raises these issues on appeal[2]: (1) The evidence is insufficient to prove McCarty intentionally or knowingly misused government property or

---

[1] The values of misuse and their associated punishments were amended in 2015. *See* Act of May 31, 2015, 84th Leg., R.S., ch. 1251, § 28, 2015 Tex. Sess. Law Serv. 4208, 4219–20. Because the amendment directs that it applies only to offenses committed on or after the effective date of the act, September 1, 2015, and the date that the commission of any of the elements occurred was prior to the effective date, in addition to, because the defendant was charged with violating the statute pursuant to one scheme or continuing course of conduct, we apply the prior law in effect before the 2015 amendment. *See* Act of May 31, 2015, 84th Leg., R.S., ch. 1251, §§ 30(a), 31, 2015 Tex. Sess. Law Serv. 4208, 4220–21.

[2] McCarty raises eight issues on appeal, but there are essentially four identical issues for each count.

personnel; (2) the trial court reversibly erred in refusing his requested accomplice-witness instruction on both counts for Jo Carol Bolt; (3) the trial court reversibly erred in refusing his request for an accomplice-witness instruction for David Murphy on both counts; and (4) the trial court erred in denying his motion to quash the indictment for both counts. We reverse the trial court's judgment.

## I. Background

McCarty was elected as Liberty County Commissioner of Precinct 1 and took office in January 2013. By all accounts, he had a more hands-on management style than prior Precinct 1 Commissioners. Before taking office, McCarty owned several oilfield service businesses. When he took office, only one of these businesses, Triangle Petroleum (Triangle), was still operating. Triangle's operations included a disposal well where trucks from surrounding oilfields deposited saltwater and drilling waste. The only person Triangle paid during this time was Clair "Buck" Gordon. Gordon performed duties for Triangle and helped with McCarty's small farming operation.

Gordon began working for McCarty as a truck driver in 1989 when Triangle included a trucking operation. Over the years, there were periods where Gordon worked part-time for McCarty, periods where he worked full-time for McCarty, and

3

yet other times where he was not working for McCarty at all. Every few years, Gordon would go work elsewhere.

McCarty became ill in 2010 and was hospitalized from August until November. McCarty continued receiving treatment for a year after he was discharged from the hospital. While McCarty was sick, Gordon took care of the disposal well and farm for him. This was Gordon's only employment, and McCarty paid him twenty dollars per hour weekly. McCarty and his wife both wrote checks to Gordon over the years and did not require detailed time reporting. Gordon told the McCartys his hours, and they wrote him a check.

McCarty ultimately recovered and decided to run for commissioner, which became his primary occupation. McCarty's election campaign was time-consuming and took him away from his business and his farm. During the campaign, Gordon continued taking care of the farm and disposal well. The disposal business eventually slowed with the downturn of the oil market. Gordon testified McCarty paid him less regularly during this period, and he voiced these concerns to McCarty. When McCarty became commissioner, Gordon claimed McCarty owed him $13,000.00 for work done previously. At trial, however, McCarty testified he did not owe Gordon any money, and instead, advanced him money sometimes in the past. McCarty claimed he paid Gordon an extra $200 per week for almost a year. He also asserted

4

he had given Gordon a lawnmower valued at $3,000.00 he expected Gordon to work off. Contrary to this, McCarty admitted at trial he told the Texas Ranger during the investigation he owed Gordon about $3,000.00. Gordon eventually went to work for the county as a "contract employee" for Precinct 1.[3]

Following an investigation by the Texas Rangers, McCarty was indicted. The specific charges for misuse of government personnel in the amended indictment were:

> Directing Liberty County personnel to perform tasks related to and in furtherance of the Defendant's private enterprise known as Triangle Petroleum Service, thereby resulting in a personal benefit to Defendant, and/or

> Directing Liberty County personnel to perform tasks related to and in furtherance of the Defendant's private farming/ranching enterprise, thereby resulting in a personal benefit to Defendant, and/or

> Directing Liberty County personnel to purchase supplies and transport said supplies to Defendant's private enterprise known as Triangle Petroleum Service, thereby resulting in a personal benefit to Defendant, and/or

> Directing Liberty County personnel to perform administrative tasks related to or in furtherance of the Defendant's private enterprise known as Triangle Petroleum Service, thereby resulting in a personal benefit to Defendant, and/or

---

[3] Witnesses, including Gordon and McCarty, consistently referred to Gordon as a "contract employee." That said, the county auditor and accountant indicated the county incurred penalties from the IRS related to Gordon's employment status.

5

Directing Liberty County personnel to perform repairs on non-government equipment belonging to Randy Humber, a personal friend of the Defendant, and/or

Directing Liberty County personnel to perform tasks related to a private birthday celebration while on county time and while being compensated as county employees with no benefit to Liberty County; to wit: delivering supplies and equipment in preparation for the birthday celebration and retrieving same after the fact, and/or

Directing Liberty County personnel to perform repairs on a vehicle and or non-government equipment belonging to the Defendant, thereby resulting in a personal benefit to Defendant, and/or

Directing Liberty County personnel to transport personal cooking equipment belonging to the Defendant, including numerous barbeque pits owned by the Defendant to be utilized at a Chamber of Commerce event thereby resulting in a personal benefit to Defendant, and/or

Directing Liberty County personnel to use equipment belonging to Liberty County to *grade* or otherwise improve a private road that provides access to the Defendant's private property, thereby resulting in a personal benefit to Defendant, . . .

THAT HAD COME INTO DEFENDANT'S POSSESSION OR CUSTODY BY VIRTUE OF HIS OFFICE OR EMPLOYMENT, AND THE VALUE OF THE MISUSED THING WAS greater than $1,500 but less than $20,000,

And the MISUSE OF GOVERNMENT PERSONNEL was conducted pursuant to one scheme or continuing course of conduct which began on or about the 1st day of January 2013 and continued until on or about the 1st day of January 2015[.]

6

The acts charged as misuse of government property in the amended indictment were:

Directing Liberty County personnel to use a county-owned motor vehicle and or a truck to perform tasks related to and in furtherance of the Defendant's private enterprise known as Triangle Petroleum Service, thereby resulting in a personal benefit to Defendant, and/or

Directing Liberty County personnel to use a county-owned motor vehicle and or a truck to perform tasks related to and in furtherance of the Defendant's private farming/ranching enterprise, thereby resulting in a personal benefit to Defendant, and/or

Directing Liberty County personnel to purchase supplies and use a county-owned motor vehicle and or a truck and trailer to transport said supplies to Defendant's private enterprise known as Triangle Petroleum Service, thereby resulting in a personal benefit to Defendant, and/or

Directing Liberty County personnel to use county-owned tools and or equipment to perform repairs on non-government equipment belonging to Randy Humber, a personal friend of the Defendant, and/or

Directing Liberty County personnel, to use a county-owned motor vehicle and or a truck to perform tasks related to a private birthday celebration while on county time and while being compensated as county employees with no benefit to Liberty County; to wit: delivering supplies and equipment in preparation for the birthday celebration and retrieving same after the fact, and/or

Directing Liberty County personnel to use county-owned tools and or equipment to perform repairs on a vehicle and or non-government equipment belonging to the Defendant, thereby resulting in a personal benefit to Defendant, and/or

Directing Liberty County personnel, to use a county-owned motor vehicle and or a truck and trailer to transport personal cooking equipment belonging to the Defendant, including numerous barbeque

7

pits owned by the Defendant to be utilized at a Chamber of Commerce event, thereby resulting in a personal benefit to Defendant, and/or

Directing Liberty County personnel to use county-owned fuel to fill the fuel tank of a personal vehicle belonging to the Defendant, thereby resulting in a personal benefit to Defendant, and/or

Directing Liberty County personnel to use county-owned fuel to fill the fuel tank of a personal vehicle belonging to Randy Humber, a friend of the Defendant, and/or

Directing Liberty County personnel to use a motor grader belonging to Liberty County to *grade* or otherwise improve a private road that provides access to the Defendant's private property, thereby resulting in a personal benefit to Defendant, . . .

THAT HAD COME INTO DEFENDANT'S POSSESSION OR CUSTODY BY VIRTUE OF HIS OFFICE OR EMPLOYMENT, AND THE VALUE OF THE MISUSED THING WAS greater than $1,500 but less than $20,000,

And the MISUSE OF GOVERNMENT PROPERTY was conducted pursuant to one scheme or continuing course of conduct which began on or about the 1st day of January 2013 and continued until on or about the 1st day of January 2015[.]

Several Liberty County Precinct 1 employees and former employees testified at trial including Gordon, Jo Carol Bolt, John Boston, Koby Box, Kenneth Etheridge, Randy Humber, James Lartigue, David Murphy, Edward Tanner, and McCarty. Other county employees who testified included the County Treasurer, Precinct 2 Commissioner, and former County Auditor.

8

At trial, Gordon testified McCarty had him run errands for Triangle in county vehicles on county time. Gordon also testified when he began doing contract labor for the county, McCarty instructed him to keep his county time and Triangle time separate. After several months working for the county, Gordon testified McCarty told him to stop segregating his time and submit it all through the county, even though he continued to perform work for McCarty personally. McCarty disputed this. McCarty's secretary, Jo Carol Bolt, testified she noticed irregularities in Gordon's time sheets. Even though the County employees worked Monday through Thursday of each week, Bolt noticed Gordon turned in time for purported work on Fridays, Saturdays, and Sundays. Bolt testified Gordon at times came in late because he had to go to the farm or disposal well for McCarty, but McCarty instructed Bolt to report Gordon's start time at 7:00 a.m. Bolt also recalled Gordon occasionally taking county vehicles to attend to McCarty's private business.

Several witnesses testified that McCarty directed county employees to retrieve and deliver equipment he owned to a birthday party. There was conflicting evidence as to whether county employees delivered the equipment while on county time and using county vehicles. McCarty denied the employees set up for the birthday party while on county time but recalled them setting up for the party on a Friday, since everyone agreed the party occurred on a Saturday. He also denied county employees

9

used a county truck or trailer to do so. Even so, McCarty admitted in his testimony he had county employees retrieve party supplies the following Monday during a regular work day. Box testified he spent the better part of the Monday following the party to tear down and clean the equipment.

Misuse of county fuel was another issue at trial. Gordon testified McCarty had him put county fuel in his personal vehicle. Although McCarty denied putting fuel in his personal vehicle as often as Gordon said, he corroborated a portion of Gordon's testimony by admitting he put county fuel in his personal vehicle after hauling heavy loads for the county with his personal truck. McCarty also admitted he had Gordon put three gallons of county fuel in Gordon's personal vehicle once, even though it went against county policy. McCarty's justified his action because Bolt sent Gordon to retrieve automotive parts for the county in his personal vehicle.

There were various allegations McCarty used county equipment for personal errands. McCarty admitted at trial he used a county trailer to haul bales of hay from Beaumont to his property, and he was aware the people of Liberty County owned that equipment. A State witness also testified about the typical daily rates charged to rent trailers and other equipment.

Finally, there were allegations McCarty instructed a county employee to grade a private road going to Triangle's disposal site with a county-owned road

maintainer.[4] McCarty, county employee Edward Tanner, the investigating Texas Ranger, a mechanic who repaired the grader, the county clerk, and Liberty County Precinct 2 Commissioner testified about this incident. According to county employee Edward Tanner, McCarty called him into his office and told him to pick up the maintainer from a mechanic. McCarty also directed Tanner to test it for leaks by performing a light grade on a rock road across the street from the mechanic's shop. Tanner found it odd that McCarty shut his office door when he gave these instructions. Tanner testified he made three passes down the road where McCarty told him to test the machine. Tanner suggested that normally when maintaining a road, he would make six passes but asserted he was not there to maintain it. Instead, he was only checking for oil leaks. Tanner's testimony about the need to check the equipment for leaks tracked the testimony of McCarty and the mechanic.

Tanner testified that when he tested the maintainer, he did not know whether the road was a county road. But after Tanner tested the equipment, Bolt advised him the road was private and belonged to McCarty. McCarty subsequently asked Tanner if he told anyone what he did. According to Texas Ranger Ryan Clendennen, McCarty admitted he instructed an employee to grade a road in the area, which Ranger Clendennen determined led to the Triangle disposal well site. There was

---

[4] Witnesses also referred to this piece of equipment as a "grader."

conflicting testimony from the Precinct 2 Commissioner and the County Clerk about whether the road at issue was private or county owned. The County Clerk asserted it was a public road based on maps of the area, while the Precinct 2 Commissioner testified it was a private road and never maintained by the county. The Precinct 2 Commissioner also testified he was aware of a "no trespassing" sign on the road. McCarty acknowledged at trial he told the Ranger and the grand jury he believed it was a private road. McCarty also agreed he may have told the Ranger "[p]art of me said maybe technically we shouldn't do this" about the road maintainer.

In the charge, the trial court instructed the jury that Gordon was an accomplice witness as a matter of law on both counts, and his testimony required corroboration before they could consider it. The trial court also instructed the jury that if they determined Box was an accomplice witness, his testimony must be corroborated as well. McCarty requested the trial court to include witnesses Bolt and Murphy in the accomplice witness instruction given for Box, but the trial court denied his request.

The jury convicted McCarty on both counts, the first of misusing county personnel and the second of misusing county property. The jury determined the value to be between $20 and $500 on both counts.

## II. Analysis

### A. Issues One and Two: Legal Sufficiency

In his first two issues, McCarty argues the evidence is insufficient to prove he intentionally or knowingly misused government personnel or property. *See* Tex. Penal Code Ann. § 39.02(a)(2). When there is a challenge to the sufficiency of the evidence, we review the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *See Brooks v. State*, 323 S.W.3d 893, 895, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307 (1979)) (concluding the *Jackson* standard "is the only standard that a reviewing court should apply" when examining the sufficiency of the evidence); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). We look to all evidence in the record, including admissible and inadmissible evidence, and direct and circumstantial evidence. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). The jury is the sole judge of the witnesses' credibility and weight to be given to their testimony. *Tate v. State*, 500 S.W.3d 410, 413 (Tex. Crim. App. 2016). Juries may draw multiple reasonable inferences from facts so long as each inference is supported by the evidence presented at trial. *Id.* Accordingly, we must defer to the

jury's determinations of weight and credibility of the witnesses. *See Brooks*, 323 S.W.3d at 899.

McCarty admitted to putting county fuel in personal vehicles and acknowledged it went against county policy. McCarty also admitted using a county trailer to haul hay to his farm. There was conflicting testimony about who owned the equipment used and when county employees delivered supplies to a birthday party, but McCarty admitted he instructed county employees to retrieve the supplies after the party while on county time.

> The Penal Code defines "misuse" as dealing with property contrary to:
>
> (A)    an agreement under which the public servant holds the property;
> (B)    a contract of employment or oath of office of a public servant;
> (C)    a law, including provisions of the General Appropriations Act specifically relating to government property, that prescribes the manner of custody or disposition of the property; or
> (D)    a limited purpose for which the property is delivered or received.

Tex. Penal Code Ann. § 39.01(2) (West 2016).

In support of his argument the evidence was legally insufficient to support that he intentionally or knowingly misused government property or personnel, McCarty contends there was no evidence of any agreement under which McCarty held the property, whether a contract of employment or oath of office relevant to the case existed, that any laws applied to the use of the property or personnel in question, or that the property or personnel was delivered for a limited purpose. We disagree.

14

The former County Auditor testified commissioners were paid about $15,000 per year as a vehicle allowance to pay for, maintain, and put fuel in their personal vehicles. So, they were not entitled to use county personnel to work on their vehicles or to put county fuel in their vehicles. And McCarty agreed it was wrong to put county fuel in personal vehicle. McCarty also conceded he used a county trailer to haul hay for his farm. A rational trier of fact may draw logical inferences. *Jackson*, 443 U.S. at 319; *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015). From McCarty's testimony, a jury could have determined beyond a reasonable doubt that policies existed prohibiting this type of use of county property and personnel and McCarty used the county property and personnel in violation of the limited purpose for which it was entrusted to him, and McCarty was aware of these prohibitions.

McCarty attempted to justify the tasks he directed county employees to perform on his personal equipment and vehicles in addition to his use of county equipment and personnel by pointing out he allowed the county to use his personal equipment, tools, and vehicle for the benefit of the county. However, this begs the question. McCarty's contends on appeal that he did not intentionally or knowingly misuse government personnel or property, a separate element of the offense from

"intent to obtain a benefit."[5] *See* Tex. Penal Code Ann. § 39.02 (a)(2). Similarly, in *Campbell v. State*, our sister court in Amarillo upheld the conviction of a law enforcement officer for abuse of official capacity relating to the officer's use of a subordinate to install a computer in his home on police department time. 139 S.W.3d 676 (Tex. App.—Amarillo 2003, pet. ref'd). In that case, Campbell argued the computer was for personal as well as work-related uses, and thus would benefit the department. *Id.* at 684. The Amarillo Court rejected that argument noting evidence of a possible benefit to the department could not render evidence of the appellant's intent to obtain a personal benefit legally insufficient. *Id.* The Texas Supreme Court examined the predecessor statute to section 39.02 in determining whether a sheriff had misapplied county resources by directing deputies to patrol an apartment complex in exchange for free rent. *See State ex rel. Hightower v. Smith*, 671 S.W.2d 32 (Tex. 1984). The Court held the evidence legally sufficient to support a jury finding the sheriff committed an illegal act. *Id.* at 35. Since the evidence supported

---

[5] McCarty cites to a recent Texas Court of Criminal Appeals case. *See Reynolds v. Texas*, 543 S.W.3d 235, 243 (Tex. Crim. App. 2018). We find that case to be distinguishable from the one before us. Indeed, in that case, there was no evidence suggesting the appellant knew her confiscation of a child's cell phone was unlawful. *Id.* at 242. That is not the case here. There was evidence, testimony from McCarty in particular, that conveyed he knew what he did was against county policy. Thus, here there was evidence from which a rational trier of fact could determine he intentionally or knowingly misused government property and personnel.

16

the conclusion the patrols were done for his benefit, the court rejected the sheriff's argument there was no misapplication because the patrols fulfilled a legitimate function of the department. *Id.* Likewise, we conclude McCarty's "evidence of a possible public benefit, even a primary benefit, from his use of government resources does not negate the State's proof of the elements of the offense."[6] *See Campbell*, 139 S.W.3d at 686.

When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict. *See Tate*, 500 S.W.3d at 413. There was evidence from which the jury could determine McCarty was aware of the policies prohibiting the use of county property and personnel in the way he used them when he instructed them. Viewing all evidence in the light most favorable to the verdict, we conclude it was legally sufficient, and the jury was rationally justified in finding McCarty intentionally or knowingly misused government property and personnel. *See Brooks*, 323 S.W.3d at 899. We overrule McCarty's first and second issues.

**B. Issues Three through Six: Jury Charge and Accomplice-Witness Instruction**

In his next four issues, McCarty contends the trial court erred by refusing his request for an accomplice-witness instruction for Jo Carol Bolt and David Murphy

---

[6] The Amarillo Court of Appeals performed a factual sufficiency of the evidence.

on both counts. *See* Tex. Code Crim. Proc. Ann. art. 38.14. (West 2005) The charge instructed the jury that Gordon was an accomplice as a matter of law, and his testimony required corroboration. The charge also instructed the jury that if it determined Koby Box was an accomplice, the jury would have to find his testimony was corroborated by other evidence before they could consider it. The trial court refused McCarty's requested accomplice-witness instruction for Bolt and Murphy.

Under *Almanza*, we use a two-step process in reviewing jury charge error. *See Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). First, we determine whether there was error in the charge. *See Ngo*, 175 S.W.3d at 743. Second, we examine whether the appellant was harmed by the error. *See id.* The level of harm required for reversal depends on whether the appellant preserved the error by objecting at the trial court level. *Id.* at 743–44; *Ferreira v. State*, 514 S.W.3d 297, 300 (Tex. App.—Houston [14th Dist.] 2016, no pet.). If the appellant objected to the charge, we will reverse if we find "some harm[.]" *See Ngo*, 175 S.W.3d at 743–44 (citing *Almanza*, 686 S.W.2d at 171). But if the appellant failed to object to the charge, we will not reverse unless egregious harm is established by the record. *See id.* Since error was preserved by McCarty's timely request for an accomplice-witness instruction for Bolt and Murphy, we must reverse if the error is "calculated to injure the rights of

18

defendant[.]" *See* Tex. Code Crim. Proc. Ann. art. 36.19 (West 2006). We must determine if there was some harm to the defendant. *See Trevino v. State*, 100 S.W.3d 232, 242 (Tex. Crim. App. 2003) (citing *Almanza*, 686 S.W.2d at 171). The "some harm" standard requires us to find "the defendant 'suffered some actual, rather than merely theoretical, harm from the error.'" *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013) (quoting *Warner v. State*, 245 S.W.3d 458, 462 (Tex. Crim. App. 2008)). In this analysis, we consider "the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel[,] and any other relevant information revealed by the record of the trial as a whole." *Barron v. State*, 353 S.W.3d 879, 883 (Tex. Crim. App. 2011) (quoting *Almanza*, 686 S.W.2d at 171).

McCarty asserts that by not including an accomplice witness instruction for Bolt and Murphy, the jury could consider their testimony without any corroborating evidence to support his conviction. McCarty argues without including all these witnesses in the accomplice instruction, the testimony of Bolt and Murphy could be used to corroborate the testimony of Gordon and Box and vice versa in an "impermissible accomplice witness loop," which resulted in some harm to him.

"A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense

19

committed[.]" Tex. Code Crim. Proc. Ann. art. 38.14; *Druery v. State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007) (explaining accomplice testimony requires corroboration by "independent evidence tending to connect the accused with the crime"). An accomplice as a matter of fact is someone, who under the evidence, could have been charged with the same or a lesser-included offense as that with which the defendant was charged. *Zamora v. State*, 411 S.W.3d 504, 510 (Tex. Crim. App. 2013) (citing *Cocke v. State*, 201 S.W.3d 744, 747 (Tex. Crim. App. 2006)).

There are two types of accomplice-witness instructions, and the type of instruction given depends on the evidence presented. *Id.* A correct accomplice-witness instruction advises the jury either that a witness is an accomplice as a matter of law or requires the jury to determine if the witness is an accomplice as a matter of fact. *Id.* For an accomplice as a matter of law, the trial court instructs the jury the witness is an accomplice and his (or her) testimony must be corroborated. *Id.*; *Druery*, 225 S.W.3d at 498. When the evidence of a witness's complicity is conflicting, the instruction given by the trial court "asks the jury to (1) decide whether the witness is an accomplice as a matter of fact, and (2) apply the corroboration requirement, but only if it has first determined the witness is an accomplice." *Zamora*, 411 S.W.3d at 510; *Druery*, 225 S.W.3d 498–99.

20

The trial court provided the jury an instruction asking them to decide whether Box was an accomplice as a matter of fact. Box worked for McCarty as a county employee during the summer of 2014, while on break from college. Box was acquainted with McCarty and graduated high school with one of McCarty's daughters. Box had worked for McCarty on his farm in the past for wages. McCarty's daughter informed Box that he might be able to work under her father at the county maintenance barn for the summer. Box testified he worked around twelve to fourteen weeks for the county that summer, from Memorial Day to late August.

Box testified McCarty instructed him to assist the county maintenance crew however he was needed, and he was often assigned to work with Buck Gordon. On occasion, estimated at a couple of times per week, McCarty instructed him to perform personal tasks for him. Box testified that he was directed to pick up hay from the feed store and put it out for McCarty's cattle. When McCarty's horses got loose, he and other county employees helped to pen the horses. On other occasions, he was instructed to retrieve McCarty's tools and mechanical and cooking equipment from a warehouse owned by McCarty, using a county truck and trailer, and deliver it for use in various fundraising events in the county for the volunteer fire department and chamber of commerce. He testified he was also instructed to pick up equipment and other items and deliver them to a private residence for a

21

birthday party. On the Monday following the birthday party, he and other county employees were instructed to pick up the items from the party and return them to the county barn, where they spent much of a day cleaning them. While working for the county that summer, he was also asked to work on McCarty's personal lawnmower and the trailer wiring on McCarty's personal truck. He estimated he spent from ten to fifteen percent of his time that summer performing personal tasks for McCarty rather than doing work for the county.

Bolt was McCarty's secretary at the precinct barn. She testified that while she questioned Gordon's hours he submitted on his timesheets, she submitted them anyway. Bolt also testified she was aware Gordon performed non-county work while on county time. She remembered that Gordon and Box delivered hay to McCarty's farm with county equipment. Bolt testified she organized work tickets for Triangle Petroleum while on county time, but the evidence conflicted about whether she did that on her own initiative or whether McCarty asked her to do so. While McCarty admitted Bolt organized Triangle tickets on county time, it was his position that she did so on her own initiative and he did not ask her to do that for him.

David Murphy worked as a mechanic for the county for more than ten years. Murphy testified he helped Gordon and Box set up for a birthday party while on county time. Murphy admitted that he knew the birthday party was for a friend of

22

McCarty's and had nothing to do with his job responsibilities for the County. McCarty and other witnesses maintained the setup for the party did not occur while on county time and McCarty maintained Murphy voluntarily helped deliver items to the party on his own time because he wanted to borrow some of the cooking equipment after the party. Additionally, Murphy testified he worked on a wiring issue on McCarty's personal vehicle, which he felt was inappropriate. Murphy estimated it took two hours to work on the wiring connection during a normal work day. Again, McCarty justified Murphy's assignment because a county employee had damaged the wiring on his personal truck while it was being used for county purposes.

Murphy and Bolt both suggested they were simply following McCarty's directions. Bolt expressed she had concerns for her job if she refused to comply. Yet there was no evidence in the record that either Murphy or Bolt participated in the alleged misuse under duress (i.e., force, threat, or coercion). Absent such threat of force, they can still be found to be accomplice witnesses. *See State v. Trevino*, 930 S.W.2d 713, 715–16 (Tex. App.—Corpus Christi 1996, pet. ref'd).

We conclude as with Box, both Murphy and Bolt could have been charged as accomplices in this case, as both admitted to knowing the conduct they engaged in was against county policy. Thus, McCarty was entitled to an accomplice-witness

23

instruction for Bolt and Murphy. *Zamora*, 411 S.W.3d at 510; *Druery*, 225 S.W.3d 498–99; *see also Zamora v. State*, 432 S.W.3d 919, 921 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("*Zamora II*") The trial court erred in failing to include an accomplice-witness instruction for Bolt and Murphy.

Having found error in the charge that was properly preserved by a timely request for an instruction, we must now determine if McCarty suffered "some harm" as a result. *See Ngo*, 175 S.W.3d at 743–44; *Almanza*, 686 S.W.2d at 171. As stated above, when considering harm, we look to the entire jury charge, the state of the evidence, arguments of counsel, and other relevant information revealed by the record as a whole. *See Barron*, 353 S.W. 3d at 883 (quoting *Almanza*, 686 S.W.2d at 171).

### 1. Jury Charge

While the charge included an accomplice witness as a matter of law instruction for Gordon on both counts and an accomplice witness as a matter of fact for Box on both counts, the trial court summarily refused the requested accomplice as a matter of fact instructions for Bolt and Murphy on both counts. The trial court included the accomplice as a matter of fact instruction for Box, whose actions were much like those of Bolt and Murphy in that he admitted in engaging in non-county business for McCarty while on county time. Although there was some dispute about

24

the level of participation of Bolt and Murphy, there were enough facts in the record to raise the issue of their accomplice status. The jury members should have been afforded the opportunity to make that determination for themselves but were unable to do so given the charge presented.

### 2. State of the Evidence

While there is evidence from non-accomplice witnesses about some of the alleged misuse in this case, including McCarty's own admissions about some of the alleged misuse, there are yet other instances of misuse established solely by evidence from accomplice witnesses with no independent corroboration. Because the indictment alleged an ongoing "course or scheme of conduct" with multiple manner and means, there is no way to distinguish whether the jury used the testimony of Bolt and Murphy as corroboration for some of the alleged instances of misuse. Murphy's testimony was offered to corroborate the testimony of Box and Gordon about setting up for the birthday party. Murphy's testimony and Box's testimony established the amount of time and hourly rate for the party setup and was uncorroborated by any non-accomplice witness or other evidence. With respect to Gordon submitting non-county hours for payment through the county, the jury had only Bolt's testimony to corroborate Gordon's testimony on this issue. The failure of the trial court to provide the requested accomplice-witness instruction for Bolt and Murphy allowed the jury

25

to consider their testimony without first determining if they were accomplices; and if they were, to first determine whether their testimony could be corroborated independent of accomplice testimony before the jury properly considered it. Because the State charged McCarty's actions as an ongoing scheme with multiple manner and means over a period of two years, we are unable to discern whether the testimony of Bolt and Murphy was used to corroborate the testimony of Gordon and Box. Absent the accomplice-witness instruction, the jury could have done so, creating an impermissible accomplice witness loop, where one accomplice's testimony supports that of another. *See Zamora II*, 432 S.W.3d at 924. Nor can we determine whether their testimony alone was considered as evidence of the misuse alleged by the State without other corroborating evidence. Indeed, the trial court's failure to instruct the jury on the additional accomplices as a matter of fact may have resulted in the jury convicting McCarty solely on the testimony of either or both Bolt and Murphy, a circumstance the accomplice evidence rule is designed to prevent. *See Tran v. State*, 870 S.W.2d 654, 658 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd).

### 3. Arguments of Counsel

The State spent a significant portion of its closing addressing accomplice-witness testimony and instructions. Additionally, the State advised the jury that they did not have to prove each and every incident of misconduct included in the

26

indictment beyond a reasonable doubt, rather they only had to prove some of them and their value. We find this argument by the State problematic. Because both counts charged the misconduct occurred as an "ongoing scheme or course of conduct," there is no way to ascertain the specific instances of misconduct the jury found credible to support the conviction in this case and accordingly, whether accomplice-witness testimony alone was used by the jury to render their verdict. As charged, the State alleged misuse valued at "$1,500 or more but less than $20,000." The amounts the jury found on each count were far less, "$20 or more but less than $500." Clearly, the jury rejected much of the manner and means alleged in the indictment, but because we are unable to discern which of the manner and means the jury found to support the verdict, we cannot say there is no harm to the defendant.

### 4. Other Relevant Information in the Record

Other relevant information in the record includes testimony provided by Texas Ranger Clendennen admitting he asked Bolt if "she [wanted] to get something off her chest," while assuring her she was not in trouble. Implicit in this testimony is that while Bolt did something wrong, she was not going to be charged for it because the State was only looking to charge McCarty. Additionally, there was some evidence Bolt was responsible for submitting the time sheets of county employees for payment.

27

In light of the foregoing analysis, we are unable to conclude McCarty suffered no harm as a result of the trial court's error. Rather, after reviewing evidence from McCarty and other non-accomplice witnesses, the record, the entire jury charge, and the arguments of counsel, we determine McCarty suffered some harm by the trial court's refusal to provide the requested accomplice-witness instructions for Bolt and Murphy. *See Barron*, 353 S.W.3d at 883; *Reeves*, 420 S.W.3d at 816.

We sustain issues three through six.

## C. Issues Seven and Eight: The Indictment

In issues seven and eight, McCarty complains the trial court erred in denying his motion to quash count one and count two of the indictment. Because the sufficiency of the indictment sets the stage for the criminal proceedings, we address these issues despite our sustaining issues three though six.

We apply a *de novo* standard of review when examining a trial court's decision on a motion to quash an indictment. *See Lawrence v. State*, 240 S.W.3d 912, 915 (Tex. Crim. App. 2007). "The sufficiency of an indictment is a question of law." *State v. Moff*, 154 S.W.3d 599, 601 (Tex. Crim. App. 2004).

The Texas Code of Criminal Procedure sets out the requirements for an indictment in article 21.02 and provides that the "offense must be set forth in plain and intelligible words." Tex. Code Crim. Proc. Ann. art. 21.02(7) (West 2009). An

28

indictment is usually legally sufficient if it tracks the penal statute in question. *Moff*, 154 S.W.3d at 602. An indictment must allege that (1) a person, (2) committed an offense. *Teal v. State*, 230 S.W.3d 172, 179 (Tex. Crim. App. 2007) (citing *Cook v. State*, 902 S.W.2d 471 (Tex. Crim. App. 1995)). To determine if a charging instrument alleges an offense, we must decide if the allegations are clear enough that one can identify the offense alleged. *See id.* at 180. A trial court and the defendant must be able to identify what penal code provision is alleged and whether that provision vests jurisdiction in the trial court. *See id.* An indictment that tracks the statutory language generally satisfies constitutional and statutory requirements. *State v. Mays*, 967 S.W.2d 404, 406 (Tex. Crim. App. 1998).

The indictment in this case tracks the statutory language. *See id.*; *see also* Tex. Penal Code Ann. § 39.02. The two counts allege that McCarty, with an intent to obtain a benefit for himself or with intent to harm and defraud Liberty County, intentionally or knowingly misused government personnel in Count One and government property in Count Two. The indictment then sets out several manner and means by which McCarty allegedly violated the statute. The indictment further states in both counts that the misuse was conducted pursuant to one scheme or course of conduct beginning on or about January 1, 2013 and continuing until on or about January 1, 2015. *See* Tex. Penal Code Ann. § 39.02(e).

29

McCarty asserts the indictment "did not provide [him] with sufficient notice to prepare a defense for trial." McCarty complains that by failing to provide dates of his allegedly wrongful actions, the name of the employee he is alleged to have misused, or the identity of the property he is alleged to have misused, the indictment did not allow him to prepare adequately for trial.

Because the indictment tracks the language of the statute and specifically enumerates multiple ways in which McCarty is alleged to have violated the statute on each count, we conclude it is sufficient to have put him on notice and allow him adequately to prepare a defense for trial. The record is clear McCarty was not tried by ambush or surprise. Indeed, he testified with clarity on each allegation against him and provided detailed accounts of each incident, along with his rationale for engaging in the otherwise prohibited conduct.

## III. Conclusion

We conclude the evidence in this case was legally sufficient to support the jury's finding that McCarty knowingly or intentionally misused government personnel and property under the statute. We further determine the indictment was sufficient to put McCarty on notice and allow him adequately to prepare a defense. Nevertheless, the trial court erred by failing to submit accomplice-witness instructions for Bolt and Murphy, and we conclude this resulted in harm "calculated

to injure the rights of defendant[, McCarty.]" See Tex. Code Crim. Proc. Ann. art. 36.19 (West 2006). We reverse the judgments of the trial court on both counts and remand for a new trial on the merits.

REVERSED and REMANDED.

_____
CHARLES KREGER
Justice

Submitted on May 31, 2018
Opinion Delivered October 31, 2018
Do Not Publish

Before McKeithen, C.J., Kreger and Johnson, JJ.